IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>NICHOLAS ONATE,<br><br>Defendant. | 8:23CR3<br><br>**FINDINGS AND RECOMMENDATION** |

This matter is before the Court on Defendant's Motion to Suppress (Filing No. 31). An evidentiary hearing was held regarding this matter on July 24, 2023. A transcript has been filed and the motion is ripe for disposition.

For the reasons explained below, the undersigned will recommend that the Motion to Suppress be granted in part, and denied, in part.

### FACTS

Nebraska State Patrol Investigator Nicholas Bonney ("Investigator Bonney") testified at the evidentiary hearing in this case. He has been with the Nebraska State Patrol for approximately 11 years and has been assigned as a Criminal Interdiction Unit ("CIU") task force officer with the DEA for around four years. (TR. 8-9.) Investigator Bonney testified that he has received specialized training as an interdiction officer. (TR. 13.) Investigator Bonney stated that he has also been a K-9 handler for approximately two years. (TR. 19.) Investigator Bonney's K-9 is named Blu. (TR. 19.) Blu is a certified K-9 and was first certified in May 2021. (TR. 19-20; Ex. 9.) Blu continues to be trained for drug odor detection weekly. (TR. 21; TR. 11.) Blu is certified

to detect methamphetamine, cocaine, heroin, and marijuana, but is not certified to detect fentanyl. (TR. 20.)

As a task force officer, Investigator Bonney works to locate large amounts of U.S. currency or drugs at venues that are commonly used by drug-trafficking organizations to transport narcotics, such as airports, bus terminals, and train stations.[1] (TR. 9.) Investigator Bonney testified that when agents go to bus terminals, they conduct surveillance looking for suspicious behavior and bags to identify individuals smuggling narcotics. (TR. 10.) Investigator Bonney explained that suspicions bags can include those that are new, hard-sided, double-locked, missing identification, have sale tags on them, have an odor, and/or are taped up. (TR. 10; TR. 15.)

Investigator Bonney testified that in performing his duties he speaks to passengers to identify people who are part of drug-trafficking organizations, and to ensure passengers' safety. (TR. 10-11.) Investigator Bonney stated that when he speaks to passengers, he identifies himself with his badge and engages them in conversation about where they are going, where they are coming from, how long they plan to being at their destination, and whether they are traveling for business or pleasure. (TR. 11.) Investigator Bonney testified that he also asks to see passengers' bus tickets to see where they are coming from and going to, and to identify them. (TR. 12-13.)

On July 9, 2022, at approximately 5:30 a.m., Investigator Bonney was working at the bus station in Omaha, Nebraska. (TR. 31-32.) He was working with Nebraska State Patrol Investigator Nic Jaworski ("Investigator Jaworski")[2] and Investigator Steve Peck ("Investigator Peck").[3] (TR. 31-32.) Investigator Bonney was dressed in plain-clothes. (TR. 32.) He had his badge in his pocket and was wearing a hat with a camera on it. (TR. 33.) He also had a concealed handgun. (TR. 33.)

---

[1] Investigator Bonney testified that in the last four years, he has been involved in approximately 40 cases that involved the seizure of drugs at the Omaha bus terminal, including the seizure of fentanyl pills. (TR. 17-18.)

[2] Investigator Jaworski has been employed with the Nebraska State Patrol for approximately 22 years and is currently assigned to the DEA task force. (TR. 111-12.) He has been on the task force for around five years. (TR. 112.) At the time of his encounter with Defendant, Investigator Jaworski was dressed in plain clothes. (TR. 115.) Investigator Jaworski was carrying a concealed handgun and was equipped with a camera on his hat. (TR. 115.)

[3] Investigator Peck has been employed with the Nebraska State Patrol since August 2000. (TR. 129.) He is a task force officer and has been assigned to the criminal interdiction unit since 2016. (TR. 129.) At the time of his encounter with Defendant at the bus terminal, he was dressed in plain clothes with a concealed handgun and equipped with a camera on his hat. (TR. 134-35.)

While at the bus station, Investigator Bonney saw Defendant in the bus terminal. (TR. 33-34.) Investigator Bonney testified that the bus terminal facility is approximately a block long by a half of a block wide. (TR. 76-77.) Investigator Bonney said his attention was drawn to Defendant based on Defendant's backpack, which had sealed zippers and was made of a synthetic material that Investigator Bonney thought was to conceal odors based on his familiarity with those types of bags. (TR. 34; Exs. 6, 7.) Investigator Bonney approached Defendant, pulled out his badge, and immediately notified Defendant that he was not under arrest or in any trouble. (TR. 35; Ex. 1.) Investigator Bonney asked Defendant where he was traveling to, and Defendant responded he was headed to Chicago. (Ex. 1.) Investigator Bonney also asked Defendant to see his bus ticket. (TR. 35; Ex. 1.)

Investigator Bonney asked Defendant if he was coming from Denver, and Defendant responded that he was. (TR. 35; Ex. 1.) Investigator Bonney asked Defendant if he started his trip in Denver, and Defendant responded he had. (Ex. 1.) Investigator Bonney then asked Defendant if he lived in Denver and Defendant told Investigator Bonney that he had family there and had been in Denver for a day. (TR. 35; Ex. 1.) Investigator Bonney asked Defendant where he was before Denver. (TR. 36; Ex. 1.) Defendant paused for a few seconds and then hesitantly said he was coming from Las Vegas. (TR. 36; Ex. 1.) Investigator Bonney asked Defendant if he flew into Las Vegas and Defendant said no. (Ex. 1.) Investigator Bonney then asked where Defendant was before Las Vegas. Defendant paused again for a few seconds and then hesitantly said Los Angeles. (Ex. 1.) Defendant told him he started his trip in Los Angeles. (TR. 36.; Ex. 1.) Investigator Bonney asked Defendant if he lived in Los Angeles, and Defendant responded yes. (TR. 36; Ex. 1.)

Investigator Bonney clarified with Defendant that he was heading to Chicago, and Defendant confirmed his destination and stated Chicago was his last stop. (Ex. 1.) Defendant told Investigator Bonney that he was going to be in Chicago for about a week. (Ex. 1.) Investigator Bonney asked for Defendant's identification, and Defendant produced an ID. (Ex. 1.) Investigator Bonney asked Defendant about his luggage, and Defendant indicated that he had a suitcase on the bus and the backpack he was carrying. (TR. 38; Ex. 1.) Investigator Bonney asked Defendant if he had any plans in Chicago. (TR. 36; Ex. 1.) Defendant said no and explained that he was just going there to hang out. (TR. 36; Ex. 1.) Investigator Bonney asked Defendant if he knew anyone

3

in Chicago, and Defendant said he did not. (TR. 36; Ex. 1.) Investigator Bonney asked Defendant where he was staying, and Defendant said he had not booked anything yet. (TR. 36; Ex. 1.)

Investigator Bonney asked Defendant again about his plans, and Defendant said he planned to sightsee. (TR. 36; TR. 87; Ex. 1.) Investigator Bonney asked Defendant if there was anything in particular he wanted to see while in Chicago, and Defendant stated he was going to see the Magnificent Mile, where there were shops. (TR. 37; Ex. 1.) Investigator Bonney testified that he thought this was a generic answer to his question about Defendant's plans. (TR. 37.) Investigator Bonney then turned to Investigator Jaworski, who at that point was standing nearby,[4] and asked if the name on Defendant's ID matched the name on the bus ticket. (Ex. 1.) Investigator Jaworski responded, yes, and then asked Defendant to clarify his date of birth. (Ex. 1.) Investigator Jaworski testified that he asked Defendant to clarify his date of birth because Defendant's ID was faded. (TR. 116.) Investigator Bonney testified that Defendant did not make any indication that he was trying to get away from him and that Defendant did not appear to be intoxicated. (TR. 44-45; TR. 85; Ex. 1.)

Investigator Bonney testified that Defendant's responses to his questions raised reasonable suspicion. (TR. 36.) Investigator Bonney testified that he was suspicious because Defendant did not appear to be truthful about where he was coming from and Defendant's responses about where he was coming from were not normal. (TR. 36-37.) Investigator Bonney also testified that he was suspicious because Defendant's reason for going to Chicago was not clear—he did not know where he was staying or have anyone to visit. (TR. 37.) Investigator Bonney explained that he thought this was suspicious because people smuggling narcotics often do not know exactly where they are going. (TR. 38.) Investigator Bonney testified that he thought Defendant's responses to his

---

[4] Investigator Jaworski testified that he received a text message or radio call from Investigator Bonney notifying him that Investigator Bonney was speaking to someone. (TR. 120.) Investigator Jaworski testified that he approached the area where Investigator Bonney was speaking to Defendant and positioned himself along the back wall to Investigator Bonney's right (approximately five to ten feet away) so Defendant could walk away through the exit doors if he decided not to speak to Investigator Bonney. (TR. 120-21.) Investigator Jaworski was given Defendant's ID and called in for a records check. (TR. 89; TR. 121; Ex. 1.) Investigator Bonney testified it was obvious that he was working with Investigator Jaworski. (TR. 89.)

4

questions were also suspicious because they appeared to be delayed, like Defendant was trying to come up with a story. (TR. 37-38.)

Investigator Bonney then explained to Defendant why he was in the bus terminal and asked Defendant whether he had anything illegal in his bags. (Ex. 1.) Defendant responded that he did not. (Ex. 1.) Investigator Bonney asked Defendant to search his backpack and Defendant told him no. (TR. 39; Ex. 1.) Defendant did consent to officers searching his suitcase. (TR. 39-40; Ex. 1.) Investigator Bonney testified that based on his training experience, he believed Defendant was trying to show that he was cooperative by providing consent to search the suitcase because he knew there was nothing in it. (TR. 40.) Investigator Bonney testified that Defendant's refusal to provide consent for the backpack, while providing permission to search the suitcase, was suspicious because the suitcase was substantially larger than the backpack. (TR. 40.) Investigator Bonney asked Defendant for consent to perform a dog sniff on his bags, and Defendant provided consent. (TR. 40; Ex. 1.)

Defendant then asked to use the bathroom. (Ex. 1.) Investigator Bonney testified that Defendant's request to use the bathroom raised his suspicion because he had been speaking to Defendant for approximately five minutes and Defendant had not mentioned the bathroom until they started talking about searching the backpack. (TR. 40; TR. 42; Ex. 1.) Investigator Bonney testified he did not allow Defendant to use the bathroom based on a previous experience he had in January 2022 where an individual went to the bathroom and dumped narcotics. (TR. 41.) At that point, Investigator Bonney explained to Defendant that he was being detained and that he could not use the bathroom because Investigator Bonney had experiences where people dumped narcotics in the bathroom. (TR. 41-42; Ex. 1.)

Investigator Bonney then explained to Defendant that if the dog did not alert and indicate to narcotics in the bags, and he did not have anything else, Defendant would be free to go. (Ex. 1.) Investigator Bonney asked Defendant for his backpack, which Defendant provided. (Ex. 1.) Investigator Bonney introduced Investigator Jaworski and asked Defendant if he could check him for weapons. (Ex. 1.) Defendant agreed and was patted down. (Ex. 1.) Defendant mentioned that he had another bag on the bus, and Investigator Bonney said they would hurry with the dog sniff so Defendant would not miss the bus. (Ex. 1.) Investigator Jaworski told Defendant he was just being detained and was not under arrest. (TR. 116-17; Ex. 1.)

5

Investigator Bonney placed Defendant in handcuffs and explained to him that he was being handcuffed for officer safety.[5] (TR. 43, 116-17; Ex. 1.) Investigator Bonney testified that officers have had individuals run from them, fight with them, and have weapons. (TR. 43.) Investigator Jaworski also testified that individuals are handcuffed to prevent officers from having to wrestle or fight with them and sustain injuries. (TR. 117.) Investigator Jaworski mentioned a previous situation in which an officer was injured by an individual at the bus station. (TR. 117.) In that situation, he was speaking to an individual about detaining a bag and the individual grabbed the bag and ran away. (TR. 117.) Another officer chased the individual and took him to the ground, which resulted in the officer suffering a shoulder injury.[6] (TR. 117.)

Investigator Bonney led Defendant to a backroom in the bus terminal building where the public is not allowed. (TR. 42-44; Ex. 1.) Investigator Jaworski was walking in front of them as they moved to the backroom. (Ex. 1.) As they were headed toward the back room, Investigator Jaworski asked Defendant about the suitcase and Defendant indicated his name was not on it, but that he had the ticket for the suitcase. (TR. 46; Ex. 1.) Investigator Bonney testified that the lack of identification on Defendant's suitcase also raised his suspicion. (TR. 46.) After Defendant expressed some concern about boarding the bus, Investigator Bonney told Defendant that they would speak to the bus driver to make sure Defendant would get on the bus. (Ex. 1.)

Investigator Jaworski took Defendant's suitcase off the bus and brought it to the back room, where Defendant identified the suitcase. (TR. 117; TR. 123; Ex. 1.) The suitcase was rolled outside, along with his backpack, and the dog sniff was performed. (TR. 44; Ex. 1.) As the sniff was performed, Defendant remained in the back room with Investigator Peck standing by the back door. (TR. 45; Ex. 1.) Investigator Peck testified that he stood with Defendant while the dog sniff was performed and had a conversation with Defendant about his travel plans. (TR. 136; TR. 146-47.) Blu sniffed each of Defendant's bags more than once. (TR. 46; Ex. 1.) Investigator Bonney

---

[5] Investigator Peck was also in the bus terminal at the time. (TR. 89-90.) Investigator Peck testified that he encountered Defendant because Investigators Bonney and Jaworski were inside the bus terminal having a conversation with Defendant. (TR. 135.) Investigator Peck testified that he positioned himself on the south edge of the terminal lobby, near some vending machines. (TR. 144.) Investigator Peck stated that Investigator Jaworski was on the opposite side of the room, and that Investigator Bonney and Defendant were on the east wall in the center. (TR. 144.)

[6] Investigator Peck was previously injured at the bus station when a suspect ran, and Investigator Peck had to tackle the suspect to the ground. (TR. 131.) It is not clear if this is the same incident Investigator Jaworski testified about because Investigator Jaworski did not identify the officer involved.

testified that he typically has Blu sniff a bag three or four times, but he could not recall how many times Defendant's bags were sniffed. (TR. 46.) Blu did not alert or indicate to the backpack.[7] (TR. 47; Ex. 1.) Investigator Bonney testified that Blu had a quick alert to the suitcase, but Blu did not indicate to the suitcase. (TR. 47; Ex. 1.)

Following the dog sniff, Investigator Bonney took Blu back to his vehicle and then went to the back room to speak to Defendant. (TR. 56; Ex. 1.) Investigator Bonney removed Defendant's handcuffs and told him Blu did not alert or indicate. (TR. 55-56; Ex. 1.) Investigator Bonney testified that his statement about Blu not alerting rolled off his tongue and that he meant to say there was an alert, but no indication to the suitcase. (TR. 57.) Investigator Bonney testified that he could have been just referring to the backpack when he made this statement. (TR. 57.) Investigator Bonney told Defendant the odors Blu is trained to detect and mentioned items of contraband that Blu would not indicate to, such as firearms and fentanyl. (TR. 57; Ex. 1.)

When Investigator Bonney uncuffed Defendant, he told him that he was free to go, but that he was going to prepare a search warrant for both of his bags and keep the luggage for the search. (TR. 57-58; Ex. 1.) Investigator Bonney explained to Defendant he was suspicious based on Defendant's route of travel on the bus, lack of plans, lack of a place to stay. (Ex. 1.) Investigator Bonney testified that he believed he had probable cause to prepare a search warrant because Defendant's circumstances were consistent with other cases where people had been smuggling narcotics. (TR. 58.) Investigator Bonney testified that the K-9 alert did not play into his determination of probable cause and if Blu had not alerted, he still would have prepared a search warrant. (TR. 58-59.)

Investigator Bonney asked Defendant for consent to search again, and told Defendant he had the right to say no. (Ex. 1.) Investigator Bonney asked Defendant if he had a phone number so they could call him and let him know what bus station his bags would be at. (Ex. 1.) Investigator Peck asked Defendant whether there was anything in the bags that Defendant needed to get by for a couple days, and Defendant responded that he needed his things and could not leave his things behind. (Ex. 1.) Investigator Peck testified that he asked Defendant this question as a courtesy in

---

[7] A K-9 alert is an untrained K-9 behavior to a trained odor. (TR. 22.) A K-9 indication is a prescribed behavior (in Blu's case, standing, sitting, or laying) where the K-9 shows he has come into contact or is able to detect or smell the trained-narcotics. (TR. 24.)

7

the event Investigator Bonney would allow Defendant to take personal items from his bags. (TR. 157.) Investigator Bonney indicated to Defendant that if he was worried about officers keeping the luggage, he could provide consent to search to speed up the process. (TR. 63; Ex. 1.) Investigator Peck also explained that if Defendant provided consent to search, Defendant could get on the bus quicker. (Ex. 1.) Investigator Bonney told Defendant that the bus was about to leave, and that it was up to Defendant whether he wanted to get on the bus. (Ex. 1.) Investigator Peck told Defendant that his other option was for Defendant to stay, and then get on the bus the next day. (Ex. 1.) Defendant repeated that he needed his things.[8] (Ex. 1.) At this point, an individual—seemingly a representative of the bus station—approached the back room and indicated that the bus had to leave. (TR. 96-97; TR. 124; Ex. 1.) Defendant informed the officers that they needed a warrant to search his bags, that he was not leaving, and that he wanted to stay with his bags. (Ex. 1.) Investigator Bonney stated they would tell the bus that it was free to leave. (Ex. 1.) From the video, it appears that the bus left shortly after that. (Ex. 1.)

Investigator Bonney then tried to get information from Defendant about how Investigator Bonney could contact him about his luggage because Investigator Bonney did not have Defendant's phone number or address. (TR. 64; TR. 66; Ex. 1.) Investigator Bonney testified that Defendant would not provide truthful information about how to contact him. (TR. 64.) Investigator Bonney asked for Defendant's phone number. (TR. 67; Ex. 1.) Defendant provided a phone number and said he was the account holder for the phone. (TR. 67; Ex. 1.) Investigator Bonney used a source engine to look up the number, but the phone number was not under Defendant's name. (TR. 67; Ex. 1.) Defendant then told officers that the account was under his mother's name. (TR. 67; Ex. 1.)

Investigators Bonney and Jaworski began having a conversation about getting a warrant. (Ex. 1.) They were also discussing whether they should leave Defendant at the bus station or take him with them. (Ex. 1.) Defendant asked what was going on. (Ex. 1.) Investigator Jaworski told Defendant that the officers were going to the Nebraska State Patrol Office and if Defendant wanted to come, that was fine. (Ex. 1.) Investigator Bonney told Defendant that if he wanted to come

---

[8] Investigator Peck testified that Defendant was free to reboard the bus and continue his trip without his luggage, but that Defendant did not want to do so and wanted his clothes out of the bags. (TR. 138-39.)

8

with him, he would have to search Defendant's person for officer safety.[9]  (Ex. 1.)  Investigator Bonney told Defendant if he did not want his person searched he could stay at the bus station. (Ex. 1.) Defendant told Investigator Bonney that he wanted to watch the officers search his bags. (Ex. 1.) Investigator Peck then got Defendant's fingerprint. (Ex. 1.)

Investigator Bonney asked Defendant if he had a cell phone and Defendant indicated at first that he did not have it on him.  (Ex. 1.)  Investigator Bonney then repeated what Defendant said to him—that he did not have his cell phone—and Defendant then said he did have his cell phone. (Ex. 1.)  Defendant provided his number to Investigator Bonney and Investigator Bonney tried to call it, but Defendant's phone did not ring.  (Ex. 1.)  Defendant told Investigator Bonney that his phone was dead. (Ex. 1.) Investigator Bonney told Defendant that his phone was not dead, and then told Defendant that the number he provided was not his phone number.  (Ex. 1.) Defendant then said the number he provided belonged to his mother. (Ex. 1.)  Investigator Bonney gave Defendant his phone number and asked Defendant to call him so Investigator Bonney would have Defendant's number.  (TR. 67; Ex. 1.) Defendant typed in Investigator Bonney's phone number but would not hit the send button. (Ex. 1.) Investigator Bonney told Defendant he had to hit send, which the Defendant finally did but then immediately terminated the call.  (Ex. 1.) Investigator Bonney gave Defendant his number again. (Ex. 1.)  Defendant typed in Investigator Bonney's number again, hit send, and then immediately terminated the call. (Ex. 1.)

Investigator Bonney testified that Defendant acted like his phone was not working or was dead, but that he could see that Defendant was typing in the numbers wrong, was not pushing the correct buttons, and that Defendant's phone was not dead. (TR. 67; Ex. 1.)  Investigator Bonney testified that he thought it was suspicious that Defendant would not provide contact information. (TR. 68-69.)  Investigator Bonney testified that it was apparent to him that Defendant was trying to distance himself from a phone number or from the officers being able to identify him or get ahold of him in any other way. (TR. 67.)  Investigator Bonney testified that because Defendant was unable to provide contact information, Defendant was detained, handcuffed, and taken to the Nebraska State Patrol Office where he remained with another officer. (TR. 64-65; TR. 69; Ex. 1.)

---

[9] Investigator Peck testified that it is policy when transporting someone who is detained or under arrest to be patted down and placed in handcuffs while they are transported for officer safety reasons.  (TR. 141.)

9

Investigator Jaworski testified that he advised Defendant of his *Miranda* rights once they arrived at the Nebraska State Patrol Office. (TR. 118; Ex. 13.)

Investigator Bonney testified that after leaving the bus terminal, he returned to the Nebraska State Patrol Office to prepare an application for a search warrant. (TR. 65.) As grounds for probable cause, Investigator Bonney's affidavit stated Defendant was traveling from Los Angeles, which Investigator Bonney knew to be a source area for controlled substances. (Ex. 8.) The affidavit stated Defendant was wearing a black backpack, made of synthetic material with sealed zippers which Investigator Bonney was aware helped seal in odors. (Ex. 8.) The affidavit stated Defendant was also traveling with a suitcase, but no information was filled out on the luggage tag attached to the suitcase. (Ex. 8.) The affidavit set out the travel plans Defendant relayed to Investigator Bonney, specifically (1) Defendant said he was coming from Denver where he had stayed a day; (2) Defendant was asked where he was before Denver, and answered six seconds later that he was in Las Vegas and that Defendant stated before Las Vegas, he was in Los Angeles, where he lives; (3) Defendant stated he was going to Chicago, but did not have any plans in Chicago or have a place to stay yet; and (4) Defendant did not know how he was getting back to Los Angeles. (Ex. 8; Ex. 13.) The affidavit noted Defendant's request to use the bathroom after he was asked for consent to search his bags, and that Defendant denied consent to search his bag, but granted permission for a dog sniff. (Ex. 8.) The affidavit stated that investigators located Defendant's suitcase and that the suitcase did not have information on the luggage tag. (Ex. 8.) The affidavit stated that Blu did not indicate to the odor of narcotics coming from the bags, but that Blu did alert to the suitcase. (Ex. 8.) Because it was a Saturday, Investigator Bonney had to contact the on-duty judge to present his affidavit and then had to meet the judge to get the warrant signed. (TR. 65; Ex. 8.)

After the warrant was signed, Investigator Bonney returned to the State Patrol Office and searched Defendant's bags. (TR. 65; TR. 70-71.) Investigator Bonney did not find any contraband in the suitcase but found 449 grams of fentanyl in the backpack. (TR. 71.) After the fentanyl was located, Defendant was placed under arrest. (TR. 72.) Investigator Bonney testified that Defendant had not been under arrest at any time until after the fentanyl was located. (TR. 72.) Investigator Bonney testified that approximately two hours elapsed from the time Defendant was handcuffed outside the bus terminal to when the fentanyl was located. (TR. 72-73.)

**DISCUSSION**

Defendant has moved to suppress the contents of the backpack, the evidence taken from his person, as well as any statements he made during his encounter with law enforcement on July 9, 2022. Defendant argues that his encounter with officers was not consensual, but instead was a seizure from its inception. He also claims he did not provide valid consent for the dog sniff. Defendant further argues that by handcuffing him following the dog sniff, officers arrested him without probable cause. Finally, Defendant claims the search warrant was not supported by probable cause and Investigator Bonney's affidavit offered in support of the warrant contained a false statement.

### 1. Consensual Encounter and Initial Detention

Defendant argues that law enforcement violated his Fourth Amendment right against unlawful search and seizure because his encounter with law enforcement was not consensual and he was detained without reasonable suspicion. This argument is unpersuasive.

"Not every encounter between law enforcement officers and an individual constitutes a seizure within the meaning of the Fourth Amendment." *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir. 1988). It is well-established that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [and] by putting questions to him." *Florida v. Royer,* 460 U.S. 491, 497 (1983). "Even without a basis to suspect a person, officers may ask to see the person's identification and request consent to search the person's luggage if the officers do not convey a message that the person must comply." *United States v. Jones,* 990 F.2d 405, 408 (8th Cir. 1993).

However, a consensual encounter can escalate into a seizure implicating the Fourth Amendment when, considering the totality of the circumstances, the questioning is "so intimidating, threatening or coercive that a reasonable person would not have believed himself free to leave." *United States v. Hathcock,* 103 F.3d 715, 718 (8th Cir.1997) (quotation omitted). "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests

11

or otherwise terminate the encounter." *Florida v. Bostick,* 501 U.S. 429, 439 (1991). Considerations relevant to this analysis include "officers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation." *United States v. Lillich*, 6 F.4th 869, 875 (8th Cir. 2021) (quotation omitted).

Defendant contends the encounter was not consensual from its very inception. As support for this argument, Defendant maintains he was the only person taken aside in the terminal and was peppered with questions and asked for his bus ticket within seconds of being stopped. The undersigned disagrees that Investigator Bonney conveyed a message that compliance with his requests were required. The record shows that Investigator Bonney approached Defendant alone (without other officers) and initiated a conversation. Investigator Bonney greeted Defendant, showed Defendant his badge, and informed Defendant he was not in any trouble. Although Investigators Jaworski and Peck eventually became involved in the situation, this only happened after Investigator Bonney initiated the conversation with Defendant. Also, Investigators Jaworski and Peck were not positioned in such a way as to limit Defendant's freedom of movement. Investigator Jaworski testified that he specially positioned himself in such a way to keep the exits clear in case Defendant decided to terminate the encounter. The officers did not display their weapons or otherwise indicate compliance with their requests was required. The undersigned finds that officers' initial encounter with Defendant was consensual.

However, as conceded by the government, what began as a consensual encounter turned into an investigatory detention once Defendant consented to the dog sniff and requested to use the bathroom. The standard of articulable justification required by the Fourth Amendment for an investigative seizure is whether the police officers were aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[ed] suspicion that a crime [was] being committed." *United States v. Martin*, 706 F.2d 263, 265 (8th Cir. 1983). A court may also consider "any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals." *United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998) (quotation omitted). However, an officer's suspicion must not be based on a mere "hunch," or on circumstances which

"describe a very broad category of predominantly innocent travelers." Id. "The totality of the circumstances—the whole picture—must be taken into account." Campbell, 843 F.2d at 1093 (quotation omitted).

By the time Defendant was informed he was detained, Officer Bonney had a reasonable suspicion of criminal activity. Defendant's travel plans and answers to questions were unusual and suspicious. United States v. Gastelum, 11 F.4th 898, 903 (8th Cir. 2021) ("[O]dd answers and strange travel plans can support a finding of reasonable suspicion"). Defendant indicated he had been in Denver for a day and was traveling to Chicago to "hang out." Defendant could not articulate any specific reason for his travels, did not know anyone in Chicago, and did not have a place to stay. The video of the encounter between Investigator Bonney and Defendant also reveals that Defendant appeared to be nervous and seemed to be making-up responses to Investigator Bonney's responses on the spot. Particularly, when Investigator Bonney asked Defendant where he had been before Denver, Defendant paused for several seconds before ultimately responding he was in Las Vegas. Defendant also paused before answering Investigator Bonney's question about where he was before Las Vegas.

Investigator Bonney's suspicion that Defendant was engaged in criminal activity was not based on a mere "hunch." Investigator Bonney, who the undersigned finds testified credibly throughout these proceedings, is an experienced officer. Investigator Bonney testified that, based on his experience, the type of backpack Defendant was carrying is often used to conceal odors. Investigator Bonney also testified that, based on his experience, he believed Defendant was trying to show that he was cooperative by providing consent to search the suitcase because he knew there was nothing in it. Investigator Bonney testified that Defendant's refusal to provide consent for the backpack, while providing permission to search the suitcase, was suspicious because the suitcase was substantially larger than the backpack. Also, the timing of Defendant's request to use the restroom was unusual. He had been speaking to officers for a few minutes and when the issue regarding searching the bags was raised, he needed to use the restroom. Based on Investigator Bonney's past experiences with individuals dumping narcotics in restrooms, his suspicion was raised by Defendant's request. Considering the totality of the circumstances, along with Investigator Bonney's experience and observations of criminal behavior, the undersigned finds there was reasonable suspicion to detain Defendant.

13

## 2. Dog Sniff

Defendant argues he did not voluntarily consent to the dog sniff. When considering whether consent was given freely and voluntarily, courts consider (1) age, (2) general intelligence and education, (3) whether the individual was under the influence of drugs or alcohol, (4) whether the individual was informed of the *Miranda* rights, and (5) whether the individual had experienced prior arrests and was thus aware of the protections the legal system affords suspected criminals. *States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990). Other factors considered include: the length of time the individual was detained; whether the police threatened, physically intimidated, or punished the suspect; whether the police made promises or misrepresentations; whether the suspect was in custody or under arrest when the consent was given; whether the consent occurred in a public or a secluded place; and whether the suspect stood by silently as the search occurred. *Id*. "These factors should not be applied mechanically, because the concept of reasonable suspicion, like probable cause, is not readily, or even usefully, reduced to a neat set of legal rules." *Id*. (internal quotation omitted).

There is no indication that Defendant's consent to the dog sniff was involuntary or somehow coerced. Defendant's initial encounter with Investigator Bonney occurred in the public area of the bus terminal, with multiple people around. Investigator Bonney approached Defendant on his own—without the presence of other officers by his side. Following some conversation, Defendant was asked if a dog could sniff his bags, and Defendant agreed. Defendant was not detained at the time consent was requested, and he was not threatened or made any promises in exchange for his consent. Defendant's entire conversation with Investigator Bonney to this point had been friendly and there is no indication Defendant was intimidated. The officers were all dressed in plain clothes and did not brandish firearms. Also, Defendant demonstrated he was aware he could deny consent to the dog sniff because he had previously denied Investigator Bonney's request to search his backpack. Defendant was 32 years old at the time,[10] was not intoxicated, and understood what officers were asking. The record shows that Defendant's consent to the dog sniff was entirely voluntary.

---

[10] The parties stipulated to Defendant's age at the evidentiary hearing. (TR. 6.)

### 3. Period Following the Dog Sniff

Defendant argues he was arrested by officers without probable cause while they secured a search warrant. The undersigned disagrees. Defendant was not under arrest at the time he was taken to the State Patrol Office prior to the search and there was a reasonable basis for his second detention.

Following the dog sniff, Defendant was unhandcuffed and told he was free to leave. Defendant expressed that he wanted to stay with his luggage while it was searched. The officers attempted to obtain contact information from Defendant so they could get in touch with him to return his luggage. However, Defendant refused to provide this information. The video of the encounter shows that Defendant falsely claimed his phone was dead and acted like he did not understand how to use his phone to call Investigator Bonney. Defendant's actions, coupled with the other information the officers had gathered by that point, increased Investigator Bonney's level of suspicion and resulted in Defendant being detained a second time. Although Defendant was placed in handcuffs before he was transported to the State Patrol Office, this did not render him under arrest. As testified to by Officer Peck, Defendant was handcuffed for officer safety pursuant to department policy. *See United States v. Martinez,* 462 F.3d 903, 907 (8th Cir.2006) (finding that officers may use handcuffs as a reasonable precaution to protect officers' safety and maintain the status quo during a *Terry* stop). Once at the State Patrol office, the handcuffs were removed. Defendant was not under arrest until the fentanyl was found in his backpack.

Further, there is no basis to conclude the length of the second detention—approximately two hours—was unreasonable. Investigator Bonney had to return to the State Patrol Office to a prepare an affidavit for a search warrant. Defendant was detained on a Saturday. Consequently, once Investigator Bonney had the paperwork prepared, he had to contact the duty-judge and meet the judge off courthouse grounds to get the warrant reviewed and signed. Once this happened, Investigator Bonney had to return to the State Patrol Office to execute the search. There is no evidence that Investigator Bonney engaged in any behavior to prolong this process. *See United States v. Cantu,* 405 F.3d 1173 (10th Cir. 2005) (finding two-and-a-half-hour detention of the defendant while police secured a warrant for search of a car reasonable). The undersigned finds that Defendant's constitutional rights were not violated by the second detention.

### 4. Search Warrant

To be constitutionally valid, "a search warrant must be supported by a showing of probable cause." *United States v. Summage*, 481 F.3d 1075, 1077 (8th Cir. 2007). "Probable cause to issue a search warrant exists when an affidavit in support of the warrant sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." *United States. v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (quotation omitted). "The determination of probable cause is made after considering the totality of the circumstances." *Id*. at 430.

Even if a warrant is not supported by the requisite probable cause, evidence seized pursuant to a defective warrant is not automatically suppressed. "Under the good-faith exception, evidence seized pursuant to a search warrant issued by a magistrate that is later determined to be invalid, will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable." *Id*. A "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the issuing judge's authorization." *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006) (quotation omitted).

An officer's reliance on a warrant may be said to be unreasonable in four circumstances: (1) when the affidavit supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for the truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid. *Proell*, 485 F.3d at 431 (quotation omitted). "[W]hen assessing the officer's good faith reliance on a search warrant under the *Leon* good faith exception, [courts] can look outside of the four corners of the affidavit and consider the totality of the circumstances, including what the officer knew but did not include in the affidavit." *United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014).

The undersigned finds that there was probable cause for issuance of the warrant. Investigator Bonney's affidavit explained that Defendant was wearing a black backpack, made of

synthetic material with sealed zippers which Investigator Bonney was aware helped seal in odors. The affidavit noted Defendant was traveling with a suitcase, but no information was filled out on the luggage tag attached to the suitcase. The affidavit set out the suspicious travel plans Defendant relayed to Investigator Bonney. The affidavit also noted Defendant's sudden request to use the bathroom after he was asked for consent to search his bags. Under the totality of the circumstances, there were sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity would be found in Defendant's bags.

Moreover, even if the warrant were deficient for lack of probable cause, the evidence found in Defendant's bags would nevertheless be admissible because Investigator Bonney's reliance on the warrant was objectively reasonable. Defendant maintains the *Leon* good faith exception does not apply because Investigator Bonney's affidavit falsely stated that Blu alerted to the presence of narcotics in the suitcase. Defendant supports this argument by pointing to Investigator Bonney's statement to Defendant that Blu neither indicated nor alerted to the presence of narcotics coming from the bags. Investigator Bonney testified that Blu did, in fact, alert to the suitcase and that his statement to Defendant was just a slip of the tongue. Investigator Bonney also testified that he could have just been referring to the lack of an indication and alert on the backpack when he made this statement to Defendant.

The undersigned does not believe the affidavit supporting the warrant contained a knowingly false statement or one made with reckless disregard for the truth. It appears to the undersigned from a review of the video that Blu may have briefly alerted to the suitcase. Further, having heard and observed the testimony at the hearing, the undersigned believes Investigator Bonney's testimony regarding the alert is credible.

There has been no argument, nor is there any evidence, that the issuing judge "wholly abandoned his judicial role." Also, it was not entirely unreasonable for Investigator Bonney to believe that the search warrant was supported by probable cause. Finally, the warrant was not so facially deficient that no police officer could reasonably interpret it as valid. The affidavit set out the circumstances surrounding the recovery and the bags and the reasons why Investigator Bonney believed there was probable cause. Based on the totality of the circumstances, the Court finds that Investigator Bonney's reliance on the warrant was objectively reasonable, and the evidence obtained through the search of Defendant's bags should not be suppressed.

**5. Statements**

*Miranda* warnings are required when a person is interrogated by law enforcement after being taken into custody. *United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012) (quotation omitted). "Interrogation" is defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

For purposes of *Miranda*, "[c]ustody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way." *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). "To determine whether a defendant was in custody for *Miranda* purposes, a court looks to the totality of the circumstances confronting the defendant at the time of the interview, and asks whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest." *Huether*, 673 F.3d at 794 (quotation omitted). "The inquiry is an objective one, without consideration of the participants' subjective views." *Id*. "The issue turns on whether a reasonable person in the suspect's shoes would have felt free to end the interview." *United States v. Roberts*, 975 F.3d 709, 716 (8th Cir. 2020).

Courts have found the following non-exhaustive factors relevant to the custody inquiry: (1) whether the suspect was informed that he was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong arm tactics or strategies were employed; (5) whether the atmosphere was police dominated; or (6) whether the suspect was placed under arrest at the end of questioning. *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). Other considerations in determining custody may include the "purpose, place and length of the interrogation." *Id*.

Defendant was not advised of his *Miranda* rights until he was at the State Patrol office. It is undisputed that when Defendant was handcuffed and taken to the back room for the dog sniff, he was in custody for purposes of *Miranda*. It is also undisputed that Defendant was in custody after he was handcuffed the second time following the dog sniff. The government agrees that some of the statements Defendant made before he received his *Miranda* advisement should be

18

suppressed. The Court finds the statements Defendant made to Investigator Peck while detained in the back room of the terminal before Defendant's handcuffs were removed should be suppressed.

However, the statements Defendant made between the time he was told he was free to leave following the dog sniff, up until he was told was being detained again, should not be suppressed. During that timeframe, Defendant was not in custody for purposes of *Miranda*. He was told he was free to go multiple times, but indicated he wanted to stay with his bags while they were searched. He was not in handcuffs or otherwise restrained. He was given the option of getting on the bus several times. After the bus departed, Defendant was informed he could stay at the bus station or officers could take him to the State Patrol office to wait. Defendant's conversation with the officers was not confrontational—the officers were simply explaining to Defendant that they were keeping the bags and would get a warrant if Defendant did not want to provide consent. Defendant's conversation with officers during this period was consensual. The conversation remained consensual up to the point he was placed in handcuffs again and detained.

Further, most (if not all) the statements Defendant made between the time he was unhandcuffed and handcuffed again, were not the result of interrogation. For instance, Defendant was not "interrogated" when he was asked for his phone number and contact information. The officers' questions about Defendant's phone number were not meant to elicit an incriminating response. Rather, officers wanted this information so they could get in touch with him to give him his bags back.

The affidavit offered in support of the search warrant did note that investigators located Defendant's suitcase and observed that it did not have information filled out on its tag. Defendant told officers his name was not on the luggage tag in response to questions that were posed to him after he was detained and being led to the back room. (TR. 46; Ex. 1.) However, the questions about the suitcase also do not amount to interrogation for purposes of *Miranda* because they were not meant to elicit an incriminating response. They were simply meant to identify the suitcase which Defendant had already consented to have searched and sniffed. Also, because officers were going to have the suitcase sniffed, they would have inevitably noticed that the suitcase did not have information on its tag, regardless of what Defendant told them about the luggage tag. Therefore,

19

the statements Defendant made to identify the suitcase while he was detained prior to being *Mirandized*, should not be suppressed.

Further, the evidence shows the statements Defendant made after being *Mirandized* were voluntary. Defendant knowingly and intelligently waived his right to remain silent. Therefore, these statements likewise should not be suppressed.

Accordingly,

**IT IS HEREBY RECOMMENDED** to Chief United States District Court Judge Robert Rossiter, Jr. that Defendant's Motion to Suppress (Filing No. 31) be granted in part, and denied, in part.

Dated this 7th day of September, 2023.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.