IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | **8:23CR3** |
| v. | | |
| NICHOLAS ONATE, | | **MEMORANDUM AND ORDER** |
| Defendant. | | |

This matter is before the Court on defendant Nicholas Onate's ("Onate") Motion to Suppress Evidence and Statements and Request for Hearing (Filing No. 31). The Court referred Onate's motion to a magistrate judge for review. *See* 28 U.S.C. § 636(b)(1) (authorizing the Court to designate a magistrate judge "to hear and determine" non-dispositive pretrial matters and to issue "proposed findings of fact and recommendations for the disposition" of motions to suppress); *accord* Fed. R. Crim. P. 59(b). The magistrate judge subsequently held a hearing at which she received evidence and heard testimony relevant to the challenging issues in this matter. In light of this record, the Court denies in part and grants in part Onate's motion to suppress.

## I.    BACKGROUND

On July 9, 2022, Onate was traveling from Denver to Chicago when the bus he was riding stopped at the Trailways station in downtown Omaha, Nebraska. That morning, Nebraska State Patrol Investigators Nicholas Bonney ("Investigator Bonney"), Nic Jaworski ("Investigator Jaworski"), and Steve Peck ("Investigator Peck" and, together the "investigators") were in the bus terminal carrying out surveillance and interdiction duties. The three investigators were spread out around various areas of the

moderately sized bus terminal, dressed in plain-clothes, carrying concealed handguns, and wearing body cameras on their hats.[1]

Investigator Bonney noticed Onate as he walked through the terminal and bought a soft drink from a vending machine.  According to Investigator Bonney, he decided to talk to Onate because his backpack, which was made of synthetic material and securely zipped[2] shut, tipped him off to possible drug activity.

Upon approaching Onate, Investigator Bonney pulled out his badge and notified him he was not under arrest or in any trouble.  He then began asking Onate questions about his travel plans and asked to see his bus ticket.  Onate told Investigator Bonney he was traveling from Denver to Chicago but had previously come from Las Vegas and, before that, from Los Angeles, where he lived.  On further questioning, Onate told Investigator Bonney he planned to stay in Chicago for about a week, did not have anywhere to stay yet, and was going to "hang[] out" and "sightsee."  He mentioned few specific plans, but stated he wished to visit downtown Chicago and the Magnificent Mile.  Meanwhile, Investigators Bonney and Jaworski confirmed that Onate's identification matched the information on his bus ticket.

Investigator Bonney testified that this conversation raised his suspicion.  He conceded that Onate was compliant, did not try to get away from the encounter, and did not appear to be intoxicated.  Yet, Investigator Bonney believed Onate acted nervously and hesitated in providing answers to the travel-related questions, and that his answers seemed "generic," "not normal," and similar to those of narcotics smugglers who often

---

[1]All three investigators testified at the suppression hearing before the magistrate judge.  The facts described herein have been pieced together from that testimony and the footage from the investigators' body-worn cameras.

[2]The government described the backpack as having "sealed zippers."  From the footage and photos of the backpack, it appears the zippers were closed, and the backpack's design provided for an extra layer of fabric enclosing the zipper.  The backpack was not otherwise sealed in any manual way by Onate.

do not "know exactly where they're going."  According to his testimony, Investigator Bonney believed this interaction—combined with the inference he made from Onate's backpack—gave him reasonable suspicion that Onate was involved in illegal drug trafficking.

Investigator Bonney moved the conversation along, explaining to Onate his reasons for surveilling the bus terminal.  In response to further questioning, Onate stated he was responsible for the items in his bags and was not in possession of anything illegal, including drugs or weapons.

Investigator Bonney then asked Onate for permission to search his bags.  Onate declined to consent to a search, stating he did not think a search would be "reasonable." Investigator Bonney next asked if a K-9 could sniff Onate's bags, to which Onate responded, "Sure that's fine."

When Investigator Bonney asked Onate for his backpack to perform the dog sniff, Onate requested to use the restroom.  In response to this request, Investigator Bonney quickly shifted gears.  He told Onate he "would have to wait" and was "being detained." When Onate asked him why he was being detained, Investigator Bonney began detailing the circumstances that made him suspect Onate was involved in criminal activity.

Onate interrupted, stating that the investigators could "check his luggage." Investigator Bonney followed up by asking if they could search his backpack as well, to which Onate originally responded "yeah."  The audio on the body camera footage is muffled following this initial statement, but Investigator Bonney later testified that Onate promptly refused consent to search the backpack.

At this point, Investigator Bonney again informed Onate that he was being detained "until [they] figured out what was going on."  He explained that he would not allow Onate to use the restroom because—in the past—individuals who have made such a request when a search is about to occur have done so intending to dump contraband or

3

otherwise evade the investigation.  Investigator Bonney assured Onate that, following the dog sniff, he would be free to leave with his luggage and use the restroom if the K-9 did not alert or indicate to anything in his bags.

Onate then complied with Investigator Bonney's directives, handing him his backpack and submitting to a frisk.  Investigator Bonney patted Onate down and did not find any weapons or other contraband on him.

In the meantime, Investigator Jaworski approached Investigator Bonney and Onate.  Investigator Bonney briefly informed Investigator Jaworski that Onate's bags were going to be sniffed and that Onate would not be allowed to use the restroom. Investigator Jaworski walked closer to Onate and announced he was being "detained for the investigation" and was "not under arrest."  Still inside the bus terminal, Investigator Bonney handcuffed Onate while Investigator Jaworski told him that the restraints were being used "for officer safety."  Onate continued to remain calm and did not resist detention.  Investigator Peck also approached the three men at this time to assist Investigators Bonney and Jaworski.

While the investigators moved him throughout the terminal, Onate responded to Investigator Jaworski's questions regarding the appearance of his luggage.  Investigator Jaworski located Onate's suitcase in the bus's luggage compartment, and Investigators Bonney and Peck accompanied Onate to a backroom of the terminal.  Investigator Jaworski brought the piece of luggage to the backroom and Onate confirmed it was his. Investigators Jaworski and Bonney then placed Onate's suitcase and backpack outside near the bus to allow Investigator Bonney's K-9, Blu,[3] to sniff the bags.

---

[3]Investigator Bonney has been Blu's handler since Blu was first certified as a Police Service Dog in May 2021.  According to Investigator Bonney, Blu is certified to detect methamphetamine, cocaine, heroin, and marijuana, and is trained weekly for drug odor detection.  Investigator Bonney testified that Blu is not trained to detect fentanyl.

4

From Investigator Bonney's body-camera footage, Blu appeared to energetically walk near the bags for about two-and-a-half minutes. During this time, Investigator Bonney directed Blu to sniff Onate's suitcase and backpack a few times, pointing near the bags to get the dog's attention. Altogether, Blu sniffed the bags about four to five times each. All the while, Onate remained handcuffed in the backroom of the bus terminal with Investigator Peck, who continued to ask him questions about his travels.

The dog sniff did not result in any indication to Onate's bags. The government maintains that Blu alerted[4] to Onate's suitcase, but there is some dispute in the record as to this point.

After the dog sniff was complete, Investigator Bonney returned to the backroom and told Onate that Blu did not alert or indicate to his bags. Investigator Bonney later testified he believed Blu did not alert or indicate to the backpack but did demonstrate a "quick alert" to the suitcase "on one of the passes." According to Investigator Bonney, the behavior he identified as a "quick alert" occurred when Blu "[brought] his attention down" to the suitcase, was "really sniffing" in a nasally, louder manner, and pinpointed his sniffing to the seam of the suitcase before eventually carrying on.

Investigator Bonney testified that, despite his unequivocal statement to Onate to the contrary, he recognized Blu's behavior as an alert at the time of the dog sniff.

---

[4]Investigator Bonney testified that a K-9 alert is an "untrained behavior to a trained odor" that signifies the K-9 is "recognizing" a trained odor but has not yet indicated to that odor. Each K-9's alert is reportedly identifiable by varied behavior specific to each dog and, generally, only recognizable to the dog's handler. Investigator Bonney testified that only after many hours spent with a K-9 can a handler learn "to observe what his alert or . . . his behavior would be as he's getting into an odor."

Investigator Bonney also testified that an indication, on the other hand, is a "prescribed" or trained behavior that signifies to the officer that the K-9 "has come in contact or is able to detect or smell" one of the trained odors and senses "the strongest source" of that odor. According to Investigator Bonney, a K-9 usually indicates to an object by standing, sitting, or laying.

Further, the K-9 deployment record Investigator Bonney prepared well after the incident, and without reviewing the body camera footage, described that Blu "stayed with the bag a little longer" on one sniff "but moved to the next." Although Investigator Bonney's report conflicted with the contemporaneous video footage in multiple respects and did not mention the word "alert," Investigator Bonney maintained that the footage—as he saw it—clearly demonstrated "a change of behavior . . . [an] alert on the last pass."

Upon returning to the backroom, where Investigator Peck remained with Onate, Investigator Bonney uncuffed Onate and told him he was not under arrest or in trouble. After informing Onate there was no alert or indication to his bags, he stated he would nonetheless keep the luggage and prepare a search warrant. He explained to Onate that he believed he had probable cause for a warrant based merely on Onate's "route of travel and his bags." When Onate disputed Investigator Bonney's description of his plans as suspicious, Investigator Bonney again sought consent to search the bags, informing Onate he would seek the warrant regardless of his response. Onate stated he could not travel without his bags and should not have to since the dog had not indicated to them.

At that time, the bus was prepared to leave without Onate. Although Investigator Bonney told him that he was free to leave, Onate expressed that he wanted to stay with his bags. The bus left without him shortly thereafter.

Investigator Bonney then began discussing with Onate how he would contact him following the planned search of his luggage pursuant to a warrant. After some back and forth, Onate provided Investigator Bonney with a phone number. The number did not appear to be registered under his name and a call to the number did not ring to Onate's phone. Although Onate tried to explain his phone was dead, Investigator Bonney's body-camera footage indicated that he could see it light up while in Onate's hands. Onate then said that the number he gave was his mother's. Investigator Bonney testified that he felt Onate was intentionally avoiding providing truthful information about his phone number.

6

Unsatisfied and frustrated with Onate's responses to the questions about his cell phone, Investigator Bonney informed Onate he would again detain him. When Onate asked Investigator Bonney why he was being detained, he responded, "Because I think there's criminal activity going on; something's going afoot; you keep lying about everything." Investigators Peck and Jaworski approached Onate and Investigator Jaworski handcuffed him. Subsequently, the investigators took Onate to the Nebraska State Patrol Office where Investigator Jaworski finally advised him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

In the meantime, Investigator Bonney prepared a search-warrant application for Onate's backpack and suitcase. The application provided information ostensibly gleaned from the investigators' extended encounter with Onate that they found suspicious including the material of his backpack, his residency in Los Angeles, and his travel plans.[5] Investigator Bonney also wrote, in contrast to statements he made at the scene just minutes before drafting his affidavit, that Blu had alerted to Onate's suitcase.

The search-warrant application was returned approved and signed by a Douglas County Court Judge. The investigators' subsequent search of Onate's bags pursuant to this warrant revealed his backpack contained 449 grams of fentanyl. Onate was arrested and later indicted (Filing No. 1) by a grand jury on one charge of possession with intent to distribute a mixture or substance containing fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1).

Onate has moved to suppress evidence and statements obtained by the investigators on multiple grounds. First, he states the evidence found through the search of his bags must be suppressed because (1) he was detained from the beginning of his encounter with the investigators without reasonable suspicion, (2) he did not give valid

---

[5]Some of those details arguably seem to have been exaggerated to bolster the investigators' suspicion. For example, Investigator Bonney averred that Onate told him "he didn't have any plans" for his trip in Chicago. To the contrary, the footage demonstrates that Onate told him he planned to sightsee and visit the Magnificent Mile.

consent for the dog sniff, (3) he was arrested without probable cause, and (4) the search warrant lacked probable cause and was the fruit of an unlawful dog sniff. Second, Onate moves to suppress "all statements made during the entirety of his encounter with law enforcement officers" because he was never given *Miranda* warnings at the bus station.

Following the suppression hearing, the magistrate judge issued her Findings and Recommendation (Filing No. 50) recommending Onate's motion should largely be denied. The magistrate judge found most of Onate's arguments largely unpersuasive but concluded "the statements [he] made to Investigator Peck while detained in the back room of the terminal before the handcuffs were removed should be suppressed" under *Miranda*. The government had conceded at the hearing that some such statements needed to be suppressed since Onate was "in custody."

Onate timely objected (Filing No. 55) to the Findings and Recommendation, urging the Court not to adopt it. He articulates six specific objections to the magistrate judge's reasoning. First, he disputes the finding that his initial encounter with the investigators was consensual, arguing that the magistrate judge did not adequately account for the physical positioning of the multiple investigators near him. Second, he argues the investigators lacked reasonable suspicion to detain him. Third, he states the magistrate judge's determination he provided valid consent for the dog sniff ignored evidence that he could have been physically intimidated by the investigators. Fourth, Onate asserts he remained detained without reasonable suspicion following the dog sniff. Fifth, he argues the search warrant was invalid insofar as it contained a false statement regarding an "alert" to one of Onate's bags. And, sixth, he urges for a broader *Miranda* conclusion reflecting the fact he was in custody at all times following his detention.

The government has responded to these objections (Filing No. 56), maintaining the magistrate judge's findings and reasoning are correct and should be adopted in full by the Court.

## II.     DISCUSSION

The Court reviews de novo the objected-to portions of the magistrate judge's Findings and Recommendation.  *See* 28 U.S.C. § 636(b)(1)(C).  The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  *Id.*; *accord* Fed. R. Crim. P. 59(b)(3).  Upon a close review of the magistrate judge's analysis and the evidence at issue, the Court agrees with her conclusions that (1) Onate was not detained at the beginning of the encounter, (2) Onate initially gave valid consent to the dog sniff, and (3) the statements Onate made to Investigator Peck while awaiting the results of the dog sniff should be suppressed.

More must be said, however, about the legality of Onate's detention.  After thoroughly reviewing the Findings and Recommendation, the evidence and arguments presented at the suppression hearing, and the parties' underlying briefing, the Court finds an important issue requires further clarification: whether the investigators' use of handcuffs to detain Onate inside the bus terminal exceeded the scope of an investigatory detention under the circumstances presented.

The government's arguments assume that Onate's motion solely challenges his detention after the dog sniff as an arrest.  The magistrate judge similarly only elaborated on the nature of this second detention after quickly concluding—without further analysis into the scope of the investigators' tactics—that the detention before the dog sniff was a lawful investigative detention.

This analysis misses the mark.  Though not a model of clarity, Onate's motion to suppress argues that investigators "arrested him" without probable cause when they "handcuffed him" before the dog sniff.  What's more, Onate's counsel reiterated at the hearing that he was unlawfully detained "upon being handcuffed," which turned the encounter into "an arrest [] without probable cause."  Finding that the magistrate judge did not analyze this issue, the Court must address it here.  Following that line of thought

9

leads to other important questions about the seizure and sniff of Onate's bags which followed this initial detention.

### A.    The Detention

The "ultimate touchstone" of the Fourth Amendment to the United States Constitution is "reasonableness." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).  In that vein, "[t]he Fourth Amendment does not forbid all or even most seizures—only unreasonable ones." *Torres v. Madrid*, 592 U.S. ___, ___, 141 S. Ct. 989, 1003 (2021).  The Fourth Amendment's reasonableness requirement "is implicated when law enforcement officers stop and briefly detain a person for investigative purposes." *United States v. Todd*, 963 F.2d 207, 210 (8th Cir. 1992); *see also Terry v. Ohio*, 392 U.S. 1, 20 (1968) (holding that an investigatory stop "must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures")).

The line between an investigatory detention and an arrest "can be hazy." *Chestnut v. Wallace*, 947 F.3d 1085, 1088 (8th Cir. 2020); *see also Pollreis v. Marzolf*, 9 F.4th 737, 745 (8th Cir. 2021).  Nonetheless, it is well established that an investigatory detention is transformed into a de facto arrest "if the officers' conduct is more intrusive than necessary for an investigative stop." *United States v. Raino*, 980 F.2d 1148, 1149 (8th Cir. 1992) (quoting *United States v. Rose*, 731 F.2d 1337, 1342 (8th Cir. 1984)); *see also Pollreis*, 9 F.4th at 745.  A de facto arrest, therefore, may arise where an investigatory detention "lasts for an unreasonably long time" or involves the use of "unreasonable force." *Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019).

Although it is not automatic, the Eighth Circuit has "held that using handcuffs can transform an investigative stop into a de facto arrest." *Pollreis*, 9 F.4th at 745.  Though the right to conduct an investigatory stop "inherently includes the right to use some degree of physical force or threat to effect the stop," *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)),

10

officers have only the "right to employ the least intrusive means to detain" a suspect in such circumstances, *United States v. Johnson*, 528 F.3d 575, 580 (8th Cir. 2008).

In light of these principles, the use of handcuffs during an investigatory stop only comports with the Fourth Amendment where it is "reasonably necessary" to "protect the officers' safety and maintain the status quo." *El-Ghazzawy*, 636 F.3d at 457, 459. "[F]or the use of handcuffs during a *Terry* stop" to constitute reasonable force, therefore, an officer must have an objectively "reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose." *Id.* (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005)).

Any such justification for the investigators' use of force is missing here. The government "fails to point to specific facts supporting [an objectively reasonable] concern for officer safety" in the circumstances of this case. *Id.* at 458. Neither the government's briefing[6] nor the investigators' testimony ever allege the investigators had a reasonable belief that Onate was armed or dangerous or that another legitimate purpose necessitated the use of handcuffs.

The investigators' testimony at the suppression hearing further demonstrates that central principles of *Terry* have been contravened. When asked on direct examination why he handcuffed Onate, Investigator Bonney responded, "[P]eople with narcotics and/or illegal substances and/or weapons, they do not want to be caught. They do not want to be detained. So we have had people that have ran from us, [fought] us, ha[d] weapons, [and] ha[d] machetes." In the investigators' minds, such unparticularized concerns justify the use of handcuffs during the investigative detention of any suspect, even the most compliant ones. Therefore, by Investigator Bonney's own account, Onate

---

[6]The government's briefing is also flawed insofar as it asserts that "detention was only pursued after Onate was deceptive about his phone number" following the dog sniff. A review of the footage from the investigators' body cameras clearly contradicts this description of the events as the investigators told Onate multiple times he was being detained—and put him in handcuffs—before the dog sniff.

was not handcuffed out of any individualized belief he posed a threat to the investigators but rather because "when [investigators] reach" the point of detainment, they usually "place the individual into handcuffs" out of generalized safety concerns.

The investigators may understandably be worried about attempted altercations or the like while conducting investigative stops and searches of travelers. But the Fourth Amendment does not permit the routine use of handcuffs as an unyielding matter of policy during an investigatory stop. Under this logic, "officers would be allowed to handcuff, frisk, and detain virtually every suspect they encounter, without regard to the nature of the crime, the behavior exhibited by the suspect, or the circumstances surrounding the alleged crime, under the pretext of officer safety. *Terry* does not permit such intrusive measures in the absence of any objective safety concerns." *El-Ghazzawy*, 636 F.3d at 458-59.

The Court's review of the evidence further demonstrates the investigators' use of handcuffs was overly intrusive under the circumstances. In *El-Ghazzawy*, the Eighth Circuit concluded an officer's use of handcuffs during an investigatory detention was unreasonable under the circumstances because (1) there was no prior information to indicate the individual "could be armed or dangerous," (2) the crime the individual "was suspected of committing . . . was not a dangerous crime," (3) the individual "exhibited no erratic or suspicious behavior" and remained "calm and cooperative," (4) the officer jumped to more intrusive steps before conducting more basic investigatory tactics, and (5) the officer had "plenty of opportunity to make the stop in a less threatening manner" where no exigent circumstances were present. *Id.* at 457-58.

The investigators here similarly never received information that Onate could be armed or dangerous, nor did Onate act in a way to give the investigators any reasonable belief he presented a safety concern. Although the investigators thought some of his answers to their questions were odd, Onate remained calm and compliant throughout the encounter. He did not behave erratically or make any sudden movements, stated he did

12

not have any weapons, and submitted immediately to frisking.  The frisking further revealed Onate did not have weapons on his person.  While the investigators suspected Onate of drug trafficking, an offense which can—in certain circumstances—raise the specter of a suspect being armed and dangerous, *see Johnson*, 528 F.3d at 580, the use of handcuffs in this case was nonetheless overly intrusive given this lack of particularized suspicion that Onate was in any way dangerous, *see Haynes v. Minnehan*, 14 F.4th 830, 836 (8th Cir. 2021) (stating that the initial suspicion of dangerousness from a belief the suspect was involved in drug trafficking did not warrant the use of handcuffs where the encounter later failed to present an "objective safety concern").

The investigators also had ample opportunities to conduct the stop and sniff "in a less threatening manner" due to the lack of exigent circumstances surrounding Onate's detention.  *El-Ghazzawy*, 636 F.3d at 458.  First, and perhaps most importantly, the need for more intrusive measures was limited given that Onate had already consented to the dog sniff prior to his detention.  Second, any exigency arguably presented by the situation was also limited by the fact that Investigator Bonney possessed Onate's backpack at the time he was handcuffed.  *Id.* (concluding handcuffing was not justified by any exigency where the supposed evidence was not in the suspect's custody).  Finally, Onate was outnumbered at all times by the three investigators present, who never appear to be under any physical threat from Onate.  *See Haynes*, 14 F.4th at 836.

This lack of identifiable danger or exigency stands in stark contrast to the circumstances in which the Eighth Circuit has found the use of handcuffs during a *Terry* stop to be reasonable.  All of those cases involved some sort of individualized suspicion that the suspect presented a reasonable threat of danger, like a strong suspicion they possessed weapons.  *See*, *e.g.*, *Pollreis*, 9 F.4th at 746 (finding the suspects were reasonably handcuffed because an officer previously heard one of the suspects usually carried a gun); *Waters*, 921 F.3d at 738 (concluding a suspect was reasonably handcuffed after "he disobeyed multiple commands to step out of his vehicle" and exhibited multiple

13

suspicious behaviors); *Johnson*, 528 F.3d at 580 (deciding a suspect was reasonably handcuffed because he likely had access to a weapon when officers were executing a search warrant for weapons); *United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999) (reasoning the suspects were reasonably handcuffed because a weapon missing from an earlier, related stop "constituted a reasonable basis to believe" they could be carrying that weapon).  Put simply, the Fourth Amendment denies the investigators "the ability to handcuff and frisk suspects absent any objective safety concern." *El-Ghazzawy*, 636 F.3d at 458.

Considering these principles and the totality of the circumstances surrounding his detention, the investigators' use of handcuffs to restrain Onate transformed the encounter into an excessive investigative detention.  The detention, therefore, became "an arrest, requiring probable cause." *Waters*, 921 F.3d at 737.

Having misconstrued Onate's arguments as discussed above, the government has made no effort to establish the existence of probable cause at this point in the encounter. Regardless, any articulable suspicion of Onate clearly fell below the probable cause required to justify his initial arrest.  *See United States v. Thabit*, 56 F.4th 1145, 1151 (8th Cir. 2023) (stating that probable cause "means more than bare suspicion" but is "less than [what is] necessary for conviction"); *Klein v. Steinkamp*, 44 F.4th 1111, 1115 (8th Cir. 2022) ("Probable cause exists under the Fourth Amendment 'when a police officer has reasonably trustworthy information that is sufficient to lead a person of reasonable caution to believe that the suspect has committed or is committing a crime.'" (quoting *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010))).   The investigator's detention of Onate in the bus terminal was therefore unreasonable and violated the Fourth Amendment.

### B.    The Dog Sniff

The nature of Onate's de facto arrest further complicates the events that followed. The government argued, and the magistrate judge agreed, that the dog sniff of Onate's

14

luggage was lawfully conducted pursuant to his earlier, voluntary consent to the procedure.  The Court finds this interpretation of the events to be overly simplistic as it glosses over the tidal change in circumstances between Onate's initial consent and the eventual dog sniff.

To "briefly detain luggage for a sniff search without violating the Fourth Amendment, [investigators] must have either the owner's consent or a reasonable suspicion supported by articulable objective facts that the luggage contains drugs." *United States v. Green*, 52 F.3d 194, 197-98 (8th Cir. 1995); *see also United States v. Place*, 462 U.S. 696, 706 (1983) (concluding that officers must have reasonable suspicion "that a traveler is carrying luggage that contains narcotics" to seize that luggage and "briefly [] investigate the circumstances that aroused" their suspicion).  The government concedes the investigators seized Onate's luggage to subject it to the dog sniff but argues that sniff was lawful based on Onate's pre-detention consent.

The Court agrees with the magistrate judge and the government that Onate's initial consent to the canine sniff was valid.  But when Onate requested to use the restroom, the circumstances surrounding the subsequent sniff changed dramatically as the encounter shifted instantly into a nonconsensual investigation.  In fact, Investigator Bonney testified that, when the investigators told Onate he was not free to use the restroom, the encounter was "no longer consensual" as the investigators had "moved into detainment."  In other words, instead of proceeding on Onate's consent to the sniff, the investigators had decided they were better off restraining him and conducting the sniff based on what they believed were reasonable suspicions that he was involved in drug trafficking.

The statements the investigators made to Onate at the time of his detention further evince this change.  First, the investigators made multiple authoritative statements that they were "going to do a sniff" of his bags.  Investigator Bonney also directed Onate to remove his backpack and hand it over to him after informing him he was no longer free to leave.  These statements no longer made refusal of the dog sniff an option for Onate,

15

thus transforming the seizure of his luggage into a nonconsensual procedure. *See United States v. DaCruz-Mendes*, 970 F.3d 904, 908 (8th Cir. 2020) (stating an encounter is only consensual "so long as a reasonable person would feel free to terminate the encounter or refuse to answer questions"); *cf. Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 234 (1973) (explaining the right of an individual to refuse consent underlies the concept of voluntary consent to search even though voluntariness does not "require proof of knowledge of a right to refuse consent").

Second, upon detaining Onate, Investigator Bonney described the factors he believed constituted reasonable suspicion for the detention and the investigation of his luggage. Specifically, Investigator Bonney informed Onate he would not be free to leave until the investigators "figured out what [was] going on," stated that his suspicion was primarily based on his travel plans, and described why his request to use the restroom raised additional flags that he may have drugs in his backpack. These statements demonstrated to Onate that they were seizing his luggage for a dog sniff because of the suspicion they felt they had gathered to this point. Moreover, Investigator Bonney testified he planned to take Onate's bags and write a search warrant for them prior to and regardless of the results of the dog sniff—further indicating he felt he had sufficient suspicion to proceed without valid consent.

In sum, the investigators' contemporaneous actions and statements made clear they were seizing Onate's luggage on the basis of their suspicions, not any semblance of consent remaining from what had been—before they changed tactics—a voluntary encounter. They, therefore, must have had "reasonable suspicion supported by articulable objective facts that [Onate's] luggage contain[ed] drugs" to seize his backpack and suitcase and perform the dog sniff. *Green*, 52 F.3d at 197-98.

The government contends that the investigators had sufficient reasonable suspicion based on the design of Onate's backpack, his purportedly "vague and

undetailed answers about his travels," that he "acted nervous," and that he had requested to use the restroom.[7]  The government's argument is unconvincing.

Reasonable suspicion is a lower standard than probable cause but must be supported by something "more substantial than inarticulate hunches."  *Terry*, 392 U.S. at 22.  The government must be able to "point to particular facts and inferences rationally drawn from those facts that, when viewed under the totality of the circumstances and in light of the officer's experience, create a reasonable suspicion of criminal activity." *United States v. Weaver*, 966 F.2d 391, 394 (8th Cir. 1992); *accord United States v. Stokes*, 62 F.4th 1104, 1107 (8th Cir. 2023).

"When an officer can cite only one or two facts, including a generic claim of nervousness, as supporting his determination of reasonable suspicion, [a court] may conclude that his suspicion was not reasonable, for 'it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.'"  *United States v. Jones*, 269 F.3d 919, 929 (8th Cir. 2001) (first citing *United States v. Bloomfield*, 40 F.3d 910, 918 n.9 (8th Cir. 1994), then quoting *United States v. Beck*, 140 F.3d 1129, 1137 (8th Cir. 1998)).

To start, the inference of suspicion the investigators attempt to draw from the material and design of Onate's backpack strains credulity.  The government describes Onate's backpack as having "sealed zippers and [being] made of synthetic material

---

[7]The only additional circumstance the investigators seemed to find suspicious at the time of the investigation was Onate's "route of travel"—in other words, the fact that he resided in and traveled through "source" areas for drugs.  The government has not brought this element to the foreground in arguing against suppression.  However, any weight given to this factor, which is of questionable significance, would not alter the Court's conclusion herein.  *See United States v. Jimenez*, 75 F.4th 848, 854-55 (8th Cir. 2023) (concluding the suspect's travel route through two "source states" for drugs "was entitled to some, even if little, weight"); *Johnson*, 171 F.3d at 605 (explaining that the significance of California's role as a "source state" was "undermine[d]" by the fact that it was the "most populous state in the country, as well as one of the most frequently visited states"); *Beck*, 140 F.3d at 1137-38 (same).

designed to keep odors inside." The images and footage of the backpack, however, show nothing out of the ordinary.

The backpack's nylon-like material is commonly used by popular brands, especially for bags designed for sports, outdoor activities, and travel. Further, the image of the backpack shows the zippers appear to have simply been zipped shut and protected by a layer of synthetic material that laid over the zippers' teeth, a feature that—as highlighted at the suppression hearing—is often utilized by manufacturers for its waterproofing benefits. The investigators' testimony also provides no support for their contention that this feature keeps odors undetectable. With such ordinary characteristics, it is not reasonable to infer the backpack was specifically designed or chosen by Onate to conceal narcotics, particularly when many innocent travelers own such bags due to their durability, waterproofing, or style. *See Jimenez*, 75 F.4th at 856 (diminishing the significance of the fact the defendant was wearing a blanket at the bus station since "it [was] not uncommon to travel with a blanket").

Additionally, though "nervous, evasive behavior" can be relevant in the calculation of reasonable suspicion, *see Illinois v.* Wardlow, 528 U.S. 119, 124 (2000), courts are—for good reason—hesitant to give too much significance to officers' subjective evaluations of a suspect's purportedly nervous demeanor, *see Beck*, 140 F.3d at 1139. It is not uncommon for most individuals to "exhibit signs of nervousness when confronted by a law enforcement officer." *Beck*, 140 F.3d at 1139. Thus, the Eighth Circuit has found the suspicion arising from supposedly "nervous" behavior especially doubtful "where the alleged signs of nervousness are not the kind of 'unusual,' 'exceptional,' or more objective manifestations of nervousness that might, in combination with" other largely ordinary factors, "support a finding of reasonable suspicion." *Jones*, 269 F.3d at 929; *see also Weaver*, 966 F.2d at 396 (considering the defendant's nervousness as contributing to reasonable suspicion where it "exceed[ed] that exhibited by non-drug carrying passengers").

18

Onate did not appear to be more nervous than any ordinary traveler would be when approached by law enforcement. The Court has reviewed the footage several times and finds, for the most part, Onate displayed a relatively calm demeanor leading up to his detention. At most, the footage shows him slightly fidgeting with his backpack's straps and taking a while to respond to Investigator Bonney's questions at times. Onate did not otherwise appear to objectively manifest excessive nervousness through an abnormal amount of rapid speech, trembling, swaying, rummaging or fidgeting with belongings, or sweating, as has supported reasonable suspicion in previous cases. *See United States v. Xiang*, 67 F.4th 895, 898-99 (8th Cir. 2023); *Green*, 52 F.3d at 196; *Bloomfield*, 40 F.3d at 918-19; *Weaver*, 966 F.2d at 396. The investigators' belief that Onate acted "nervous" is, in the main, too generic and not supported by objectively excessive behavior to contribute much to the reasonable suspicion calculation.

The Court similarly gives only minimal weight to Onate's responses to questions about his travel plans. The Eighth Circuit has found "'odd answers' and strange travel plans can support a finding of reasonable suspicion" to prolong traffic stops. *United States v. Gastelum*, 11 F.4th 898, 903 (8th Cir. 2021) (quoting *United States v. Pacheco*, 996 F.3d 508, 512 (8th Cir. 2021)). However, implicit in the nature of a consensual encounter with law enforcement is the principle that "a person's refusal to provide only some of the requested information" or to entirely ignore the questioning altogether must not be considered in the reasonable-suspicion calculus. *Chestnut*, 947 F.3d at 1089.

Since Onate was entitled to leave out some or all of the details about his travel plans under these circumstances, it seems illogical to assign much weight to the fact that he did not provide much of an itinerary beyond his desire to "sightsee." Even so, the Court finds any purported abnormality of Onate's travel plans has been overblown by the government and falls short of the clearly dubious or unusual plans that have contributed to reasonable suspicion in other cases. *Compare Pacheco*, 996 F.3d at 512 (concluding travel plans contributed to reasonable suspicion where suspect stated he was traveling to

Iowa "even though he was already in Iowa" and could not remember "the name of the town to which he was travelling"), *and United States v. Sanchez*, 955 F.3d 669, 675 (8th Cir. 2020) (deciding travel plans contributed to reasonable suspicion where suspect answered that they were traveling to a "two-to-three-day painting job" but only had a "single can of paint"), *with Beck*, 140 F.3d at 1139 (concluding travel plans did not contribute to reasonable suspicion where the suspect's intent to travel across the United States to procure employment as a truck driver was "subjectively disbelie[ved]" by the officer but not objectively unusual).

For similar reasons, Onate's request to use the restroom is entitled to little weight. First, under the circumstances, it is not out of the ordinary for a traveler on a long bus trip to use the restroom during a brief break from the road. The Court gives due consideration to Investigator Bonney's experience in finding that travelers had, on prior occasions, dumped drugs in the bus-station restroom. That being said, it seems just as likely that the request to use the restroom at that time in the encounter could be seen as an ordinary and innocent decision based on travel and timing concerns.

Second, because the encounter remained consensual at this moment, Onate should have—in principle—been free to terminate the conversation, walk away, and use the restroom on his own accord. *See Royer*, 460 U.S. at 497-98. Investigator Bonney testified to this end himself, stating that Onate had not tried to get away from the encounter but "could have" prior to his detention. "Though a person's unprovoked 'flight' from police may be considered in the reasonable-suspicion calculus, a person's decision during a consensual police encounter 'to ignore the police and go about his business' cannot." *United States v. Sykes*, 914 F.3d 615, 618 (8th Cir. 2019) (quoting *Wardlow*, 528 U.S. at 125). Onate's decision to ask for permission to use the restroom instead of fleeing the encounter, therefore, contributes little if any weight to the Court's reasonable-suspicion analysis.

Viewing these factors together and giving credence to the investigators' experience, the totality of the circumstances do not amount to reasonable suspicion here. "In *United States v. Sokolow,* 490 U.S. 1, 109 S. Ct. 1581, 104 L.Ed.2d 1 (1989), the Supreme Court observed that factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion." *Beck*, 140 F.3d at 1137. However, multiple ordinary or innocent facts cannot always be transformed into reasonable suspicion through the government's mere reliance on the totality-of-the-circumstances standard. Instead, there must be "concrete reasons for such an interpretation" warranting a finding of reasonable suspicion from "a combination of wholly innocent factors." *Id.* (quoting *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997)); *Jones*, 269 F.3d at 929.

On balance, the largely innocuous factors present here—the common design of Onate's backpack, his relatively calm demeanor, his description of his travel plans, and his request to use the restroom—fall short under these circumstances. Thus, the government has failed to demonstrate the investigators had "reasonable suspicion supported by articulable objective facts" of drug possession to seize Onate's bags. *Green*, 52 F.3d at 197-98. Onate's Fourth Amendment rights were therefore violated by the investigators' seizure of his bags.

## C.   The Fruits

Having found that both the investigators' pre-sniff detention of Onate and seizure of his luggage violated the Fourth Amendment, "any evidence obtained therefrom is inadmissible." *Jimenez*, 75 F.4th at 856; *see United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001) ("If the investigatory stop is not justified by reasonable suspicion or if the investigating officers exceed the stop's proper scope, any evidence derived from the stop is inadmissible at trial.").

As a result, the Court finds the physical evidence obtained from the search of Onate's bags must be suppressed as derivative of the unlawful detention and dog sniff. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *Place*, 462 U.S. at 710

(deciding that "the seizure of respondent's luggage was unreasonable" therefore "the evidence obtained from the subsequent search of his luggage was inadmissible"); *United States v. Villa-Gonzalez*, 623 F.3d 526, 535 (8th Cir. 2010) (concluding the suppression of evidence discovered during a search of the defendant's residence was proper where the warrant application contained information derived from statements made during an unlawful seizure). The statements Onate made to investigators following his unlawful arrest must also be suppressed. *See Wong Sun*, 371 U.S. at 485 (explaining "verbal evidence which derives so immediately from" an unauthorized arrest "is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion").

## III.   CONCLUSION

On these specific facts, the investigators' tactics violated Onate's Fourth Amendment rights. Suppression of evidence derived from their investigation is, generally, an appropriate and necessary response to safeguard against the violation of those rights. *See Nix v. Williams*, 467 U.S. 431, 444 (1984) (stating that the courts "begin with the premise that the challenged evidence is in some sense the product of illegal governmental activity" (quoting *United States v. Crews*, 445 U.S. 463, 471 (1980))). The government has not put forth a viable theory[8] that any exception to that general principle should prevent the suppression of evidence here. *See Nix*, 467 U.S. at 444 (stating that the burden was on the prosecution to "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means" to prevent suppression); *United States v. Alvarez-Manzo*, 570 F.3d 1070, 1077 (8th Cir. 2009) (upholding the suppression of evidence where the government

---

[8]The government's sole argument to the contrary pertains to the investigators' reliance on the search warrant. *See United States v. Leon*, 468 U.S. 897, 922 (1984) (stating that the evidence need not be suppressed where it was obtained through officials' "objectively reasonable reliance on a subsequently invalidated search warrant"). Such reasoning is inapplicable here, however, due to the Court's finding that the warrant and subsequent search were fruits of prior unlawful acts.

"failed to demonstrate" any attenuation or purging of the causal connection between the officer's unlawful conduct and the purported fruits).

Therefore, based on the Court's careful review and foregoing analysis of these complex, case-specific issues,

IT IS ORDERED:

1. Onate's objections (Filing No. 55) are sustained in part and overruled in part.

2. The magistrate judge's Findings and Recommendation (Filing No. 50) is accepted in part and rejected in part as set forth in this Memorandum and Order.

3. Onate's Motion to Suppress (Filing No. 31) is granted in part and denied in part.

Dated this 20th day of November 2023.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge